STATE OF MAINE                     SUPERIOR COURT
HANCOCK, SS.                       CIVIL ACTION
                                   Docket No. CV-04-36
                                   JL٭ ~HAN-4/ 7 2٭٭٭

Northeast Marine Towing and
Construction, Inc.,
        Plaintiff


        v.                              Decision and Judgment

DONALD L. GARBRECHT
LAW LIBRARY

City of Ellsworth et al.,
        Defendants                 MAY ٭ ٭ ٭


A consolidated hearing was held on the complaint of plaintiff Northeast Marine
Towing and Construction, Inc. (NEM) and on the counterclaim of defendant City of
Ellsworth. At trial, a representative of NEM and counsel for NEM were present. The
defendants appeared through counsel and, during portions of the trial, through
representatives of those parties.

The pending claims arise out of a contract between NEM and the City, under
which NEM agreed to dredge a portion of the City's harbor in the Union River. For the
reasons stated in this order, the court concludes that NEM materially breached its contract
and that the City terminated the contract for cause. On this basis, the court awards relief
to the City. The court also concludes that defendant Woodard & Curran, Inc. (W&C)
was not a party to the contract, that it acted entirely as the City's agent and that it is not
liable to NEM.


## A. Findings of fact

### 1. The project and the contract

The Union River extends from Union Bay, a saltwater body, to Ellsworth and
beyond. In the late 1990's, the Army Corps of Engineers (ACOE) initiated a project to
perform maintenance dredging of the federal navigational channel within the Union River
between Union Bay and the City's harbor. The purpose of this project was to improve
the quality of the channel for use by boats and other vessels. In coordination with the

1

ACOE project, the City initiated its own efforts to dredge sections of the harbor abutting the terminus of the federal channel, near the City's public boat landing. The City's dredging plans was one aspect of a harbor revitalization program. The proposed City dredge would encompass both intertidal and subtidal areas of the harbor, covering approximately 5 acres. The planned dredge would create a subsurface depth of five feet below mean low water, which would be similar to the dredged depth of the federal channel. The City initially estimated that, to achieve these goals, the dredge would result in the removal of 28,000 cubic yards of sediment and other spoils.

The City engaged W&C to act as its agent in obtaining the permits necessary to proceed with the dredge. W&C, as the City's agent, then filed a permit application with the Maine Department of Natural Resources, which is within the Department of Environmental Protection. *See* exhibit 8. In that application, the City disclosed to DEP that W&C was acting as its agent. *See* exhibit 9b. W&C also filed a permit application with ACOE. In December 1999 and July 2000 respectively, those agencies issued permits to the City authorizing the municipal dredge project. *See* exhibit 18 (project manual, which includes copies of the permits). With those permits in hand, in January 2001, the City – through W&C – issued a project manual with invitations to bid, as part of the process of soliciting interest from marine dredging contractors. *Id.* W&C subsequently amended the January 2001 project manual to provide that projected volume of dredged material would be increased from 29,000 cubic yard to 35,500 CY. *See* exhibit 225. James Moody, W&C's project manager for the proposed dredge, sent a copy of the project manual to NEM's principal, Robert Twitchell. *See* exhibit 20. Moody forwarded the project manual to six other contractors. NEM did not submit a bid, and in fact the City received only one bid, which was from Prock Marine, a marine contractor based in Rockland. *See* exhibit 21. Prock was the contractor that had also contracted with ACOE to dredge the federal channel in the Union River. Prock's bid was based on a price of $13.25 per cubic yard of spoils removed from the harbor. The City decided not to accept Prock's bid because of the absence of any competitive bidding. *See* exhibit 23.

In April 2001, W&C issued a second project manual in a renewed effort to solicit interest in the dredging project. *See* exhibit 24. This time, NEM submitted a bid, in which it proposed to be paid at the rate of $12.50 per cubic yard. *See* exhibit 27. In its

2

proposal, NEM advised that to perform the work, it intended to acquire 2 barges, each with a 250 cubic yard capacity. *Id.* Twitchell had intended to dump the dredged material into one of those barges while the other one, which would already be filled, was hauled to the dumping ground several miles away. This way, Twitchell planned to dredge and remove 500 cubic yards per day (one load daily in each barge). In the end, however, Twitchell purchased only one barge, which had a 300 CY capacity. Twitchell looked at a second barge and was not satisfied with its condition. However, as he testified at trial, he would not have purchased a second barge even if he had found one that was seaworthy.

In its bid, NEM expressly recognized that some parts of the project area might be more difficult to dredge than others, and it therefore reserved the right to negotiate a higher rate of compensation "prior to dredging." *Id.* NEM chose its proposed rate of $12.50, nonetheless, for the specific purpose of attempting to underbid Prock, based on the bid that Prock submitted previously. In its written bid, NEM represented that it was "fully aware" of the terms and contents of the April 2001 project manual and the location of the area to be dredged. *Id.* The City viewed NEM's bid favorably, and Twitchell and the City's then-manager, Timothy King, held a pre-contract meeting on July 19, 2001, to further discuss the proposed dredging project. *See* exhibit 30.

Ultimately, on September 13, 2001, NEM and the City entered into a contract under which NEM would perform the dredging operation in the harbor area. *See* exhibit 32. As indicated in the contract, the parties estimated that the amount of material to be dredged was 35,500 cubic yards. *See id.* at Bates 2347, 2349-50. Based on the amount of materials that were projected to be dredged and removed, the total expected contract price that the City would pay to NEM was $481,250 (25,000 CY at the rate of $12.50 per CY, and 11,250 CY at the rate of $15 per CY).[1] *See id.* at Bates 2292, 2349-50. Prior to this project, the largest job that NEM had undertaken was worth approximately $40,000. In previous projects, NEM used as many as six workers. For this job, NEM began with a total of three workers, including Twitchell. One of those workers left NEM during the first season, thus leaving only two workers during the balance of the time when NEM was engaged in the dredge. Despite this history, the contract required NEM to provide

---

[1] In January 2002, the contract price to $516,022 after the parties agreed to a change order that affected the unit price per cubic yard of some of the spoils. *See* exhibit 104b.

competent and qualified personnel to do the work, *see id.* at Bates 2318, and it authorized the City to terminate the contract for cause if NEM persistently failed to provide "sufficient skilled workers or suitable materials or equipment" to conduct the dredging operation, *see id.* at Bates 2340.

The contract expressly identified NEM and the City as the parties to the agreement. W&C was not a party to the contract, and in fact the terms of the agreement recite that W&C acted as the City's representative. *See, e.g.,* exhibit 32 at Bates 2291, 2326. Thus, under the contractual arrangement to which NEM agreed, W&C was an agent for a fully disclosed principal. The contract further provided that W&C's involvement in the dredge project would not expose it to liability under claims sounding in "contract, tort or otherwise. . .," so long as W&C had acted in good faith when it engaged in the otherwise actionable conduct. *See* exhibit 32 at Bates 2328.

Pursuant to the contract, time was stated to be "of the essence," and NEM was required to substantially complete its performance by April 1, 2002. *See* exhibit 32 at Bates 2291-92, 2347. NEM was required to work during specified hours six days per week: Monday through Saturday. *Id.* at Bates 2344. NEM was entitled to be paid based on the amount of material it removed from the dredge area. As is noted above, most of spoils would generate payment of $12.50 per cubic yard. *Id.* at Bates 2349-50. For several categories of material that was more difficult to remove, NEM would be paid at the higher rate of $15 per cubic yard. *Id.* The amount of material that NEM removed would be calculated based on pre-dredge and post-dredge surveys of the harbor floor. *Id.* As would become apparent later in the dredging process, material removed from the harbor would "fluff" and increase in bulk. However, NEM was entitled to payment based on an *in situ* measurement, that is, the volume of the material before it was disturbed and removed. Thus, the difference between the amounts of material on the harbor floor as shown in the pre-dredge survey and post-dredge survey would establish the amount of material that NEM removed *in situ. Id.* This would form the basis on which NEM's payments would be established. Under the contract, NEM was responsible for providing the survey work. *Id.* at Bates 2351-52. This arrangement stands to reason, because it is in the contractor's interest to determine the amount of work that it has performed.

4

Under the contract, NEM was responsible for locating the boundaries of the dredge area. *See* exhibit 32 at Bates 2351. The City's dredge area was a function of the federal channel that Prock dredged. The City bore the responsibility to provide NEM with information that would allow it (NEM) to establish the City's dredge boundaries. *Id.* at Bates 2312. W&C was given the contractual authority to determine if the information provided by the City to NEM was sufficient to allow NEM to locate the dredge area. *Id.* This information was in the form of a map developed by or for ACOE, which showed the location of federal channel coordinates. Those coordinates marked the corners or angles of the federal channel boundary. Although the map, identified as C-7,[2] depicted a number of such coordinates, only any two of them were a sufficient basis to lay out the boundaries of the dredge. Twitchell testified that he did not receive a copy of the map until mid-December 2001, which was subsequent to the date that NEM was to commence its work. However, prior to that date, NEM was provided with a number of documents that each referred to C-7 as an exhibit. Those documents included the January 2001 project manual, the April 2001 project manual, the August 2001 project manual (which became the contract), a final project manual issued and sent to NEM in November 2001, and a separate transmittal in November 2001 (*see* exhibit 37). *See also* exhibit 35 at p. 2 (referring to delivery of three sets of plans to Twitchell; these plans included C-7). The court finds it unlikely that the C-7 map would be omitted from so many different documents, all of which Twitchell in fact received. Twitchell acknowledges that he did receive the C-7 map in December and could not start the dredge until then. Taken by itself, this delay is not significant. However, evidence that three C-7 maps were sent to NEM calls Twitchell's testimony on this point into question, which affects the court's assessment of other disputed factual points. Further, as is discussed below, NEM developed a pattern of failing to comply with the scheduling requirements associated with the dredging project, and this represents an early instance of that problem.

Along with many other provisions, the contract specified the procedure for change orders and for resolution of disputes arising under the instrument. Finally, the contract

---

[2] In one instance, a document that the City alleges included C-7 was described as "S-7." With respect to ACOE documents, an "S" exhibit refers to a map of a structural feature or object. The harbor did not include any structural elements, and so the best explanation is that "S-7" was an incorrect reference to a document that actually was C-7.

authorized the City to terminate the contract either "for cause" or "for convenience." *See* exhibit 32 at Bates 2340. The grounds that would justify a termination for cause are identified in the agreement. *See id.* A termination not for cause would be a termination for convenience. The parties' remedies associated with either form of termination are also set out in the contract.

## 2. Execution of the contract through the end of first season (September 2001-January 2002)

Under the terms of the contract, work was to commence on or after November 1, 2001, or whenever the City issued a "Notice to Proceed." The City issued that notice on November 7, 2001. *See* exhibit 32 at Bates 2297. As a condition to the commencement of work, the City required NEM to submit a "schedule of values," which is used to determine the amount that the City would pay to NEM as the project progressed. NEM did not provide the City with such an outline prior to the time it began work in December 2001 – and in fact NEM never submitted a schedule of values at any time.

At the July 19 pre-contract meeting, NEM advised the City that it intended to begin work at the end of October and continue through the end of January 2002. From the time the contract was executed through the end of October, however, the City had no contact with NEM. Because the City needed two weeks notice prior to the commencement of NEM's dredging work, the start date was compromised. At the end of October, Pat Ryder, an administrative assistant for the City, contacted Twitchell to inquire if he could start the dredge work in mid-November. *See* exhibit 34. On November 7, King, Twitchell and several others who were involved in the project met to discuss the impending project. *See* exhibit 35. Twitchell advised that he would be in the harbor on November 19 and anticipated that he would need 90 days to complete the work. At the meeting, however, Twitchell indicated that he was unaware that he was responsible to arrange for the pre-dredge survey of the project area. The City offered to assist Twitchell in lining up a marine surveyor, despite the allocation of responsibility under the contract, because the City wanted the project to get underway. By the date when Twitchell had expected to begin the dredge, work had not commenced, in part because of the delay in securing a surveyor. *See, e.g.,* exhibit 39. However, NEM could

6

not have engaged in actual dredging operation until November 16, which is when the City received permission to dump the spoils in the intended dumping area. *See* exhibit 184.

Twitchell eventually secured the firm of Plisga & Day to conduct the pre-dredge survey. Stan Plisga traveled to the dredge site on December 4 for an initial view. Twitchell was unavailable to meet Plisga there that day, apparently because he was otherwise engaged, and so he asked Ryder to find someone to show Plisga the area. Ryder and Moody, W&C's project manager, met with Plisga that day and to provided him with information relevant to the survey work. *See* exhibits 41, 43. On December 4, Moody also wrote to Twitchell about NEM's failure to begin work, despite NEM's prior assurance that the dredge would begin in mid-November. *See* exhibit 42. On December 4, either in response to Moody's letter of the same date, or simply by coincidence, Twitchell told Ryder that he could not begin work until December 11 because of mechanical problems with the tugboat that NEM planned to use for the dredge. *See* exhibit 43. Despite these representations, work did not actually begin until December 19, more than a month after NEM could have started.

In December, an issue arose regarding the location of the City dredge. Under the contract, the City was required to provide NEM with reference points that would allow NEM to locate the dredge area on the face of the earth. *See* exhibit 32 at Bates 2312. W&C, as the project engineer, was given the contractual authority to determine the sufficiency of that information. *Id.* Then, it fell to NEM to establish a surveyed location of the project boundaries based on the reference points provided by the City. *Id.* at Bates 2351. This would be the survey performed by Plisga & Day. This survey also had the dual function, noted above, of allowing a determination of the amount of material that NEM ended up removing during the course of the project, when that pre-dredge survey was compared with a post-dredge survey.

The location of the City dredge was tied directly to the location of the federal channel, because the two abutted each other. The ACOE survey was the definitive source of information identifying the location of the latter. W&C, as the final arbiter on the sufficiency of information that NEM would use to locate the project area, treated the information that way, and this view is corroborated by the testimony of several non-party

7

witnesses. That survey provided navigational coordinates, or reference points, associated with the location of the federal channel. *See* exhibit 17a (the C-7 survey). In fact, that survey identified a number of such coordinates. However, the location of the federal channel could be established by using only two of them, because once two such points were located on the face of the earth, the surveyor could use the remaining information in the survey to establish the courses and distances of the remaining lines. When Plisga conducted the pre-dredge survey in December, NEM had not provided him with the ACOE survey. Therefore, Plisga could only try to locate the City dredge area by comparing and overlaying several other surveys to try to make them line up with each other. This approach appeared to have good results. *See* exhibits 44, 175.

On December 19, NEM began the dredge. As is noted above, although NEM had advised the City that it would be using two barges, it only acquired and used one. On the first day of the dredge, Twitchell found that an area that he intended to dredge had already been cleared on sediment and spoils – in other words, that it had already been dredged. Accordingly, Twitchell reported that there were inconsistencies between the ACOE survey that identified the coordinates for the federal channel, and the recent Plisga & Day survey. *See* exhibit 226. Twitchell claims that he did not receive the federal survey (the C-7) map until December 19. Although Twitchell did receive a copy of that plan on that day, as is noted above the court finds that it was also provided to him earlier in time. However, by December 21, Twitchell, who was now using the coordinates from the ACOE survey, concluded that he had sufficient information to locate the City dredge area and that the Plisga & Day survey needed to be corrected. *See* exhibits 50, 174. Although it remained NEM's responsibility to resolve this issue, W&C's project engineer, James Wilson, undertook to relay information from the federal survey to Plisga. *See* exhibit 50. Several days later, however, Twitchell again expressed concerns about discrepancies in the surveys, and the City's project representative, Charles Leavitt, suggested that a meeting be held with W&C representatives and Twitchell to address the issue. *See* exhibit 49. In fact, on December 26, Twitchell arrived at the dredge site and asked Leavitt where *Leavitt* wanted him to dredge. *See* exhibit 175.

Brent Bridges, an employee of W&C who worked a project manager on the City dredge, continued to try to work as a liaison between NEM and Plisga & Day to help

ensure that NEM was providing the surveyor with information that would be important to the surveying work and identifying the correct location of the dredge area, as the contract required NEM to do. *See* exhibit 175. However, it appears that as late as the end of December or early January, Plisga & Day still did not have the coordinates that were included in the C-7 ACOE survey. *Id.* By January 5, Twitchell nonetheless was satisfied that he knew the location of the City channel and was dredging within those limits. *See* exhibit 53. As Twitchell testified at trial, Leavitt, the City's on-site dredge inspector, checked with him each day to see if NEM was carrying out the dredge in the correct location, and he (Twitchell) was able to assure Leavitt that it was.

In addition to Twitchell's initial uncertainty regarding the location of the City's dredge project, a second issue arose. When NEM began the dredging operation, Twitchell found that there was an unexpectedly significant amount of lumber and timbers embedded in the harbor floor. Most likely, this material had washed down the Union River into the harbor when an upstream dam had failed many years earlier. The nature of this material made the dredging process difficult because, with NEM's equipment, the size and shape of the timbers made it difficult to secure and then to load then onto the barge that NEM used to transport the dredging spoils to the dump area. Prior to the time the parties entered into the contract, W&C had evaluated the harbor floor through probes. *See* exhibit 29. That exploration did not reveal the presence of the wood or timbers that NEM came across later. When the City applied for a DEP permit that would authorize the dredge, it noted that the spoils would include, among other things, debris from the dam washout. *See* exhibit 8 at section 1. Such material, however, does not appear to have been specifically identified in the City's contract with NEM.[3]

In a dredging operation, it is not uncommon for the dredging contractor to encounter material that is different from what the parties expected. In fact, the parties' contract addressed that possibility by establishing their resulting rights and

---

[3] In a letter to the City Manger, Timothy King, W&C's project engineer, James Wilson, noted that the project specifications referred to debris from the dam. The court was unable to locate that referenced passage in the exhibits. For the reasons noted in the text, however, even if NEM had been placed on advance notice of this material that proved difficult to remove, the parties themselves agreed to a resolution, and so the issue is not material to the adjudication of the parties' claims.

responsibilities in the portion of the contract that incorporates standard contractual terms. *See* exhibit 32 at Bates 2311. Additionally, in its original written proposal to the City, NEM foresaw some possibility that the dredge would involve spoils that were difficult to remove, and NEM reserved the right to renegotiate the price for its work in that instance. *See* exhibit 27. And at the meeting held in July 2001, prior to the time the parties formally entered into the contract, Twitchell and representatives from the City and W&C discussed the possibility that if the dredged materials were more difficult to remove than the parties anticipated, there would be an adjustment to the price based on volume of spoils, and in fact the area of the dredge project could be reduced because of the increased cost to the City. *See* exhibit 30b.

Under the terms of the contract, NEM was authorized to seek a modification of the agreement based on site conditions that turn out to be different from those described in the contract itself. Such a request would be in writing. The City invited NEM to submit such a change order, and on January 22, 2002, Twitchell did so. *See* exhibit 55. In its proposed change order, NEM sought an increase in the amount it was paid "'per yard dredged.'" *Id.* The City responded with a proposal for three rates of compensation per cubic yard of spoils. *See* defendant's exhibit 57. Of the three, the rate applicable to a particular load would be determined by the length of time it took NEM to dredge that material comprising that load. Thus, for loads that took longer to dredge and load, NEM would be paid more than for those loads that took less time. This proposal did not purport to change the *in situ* unit of measurement. More importantly to this case, the City's proposal was not one that would entitle NEM to be paid based on time alone. The amount of time spent by NEM would be relevant only in determining which level of compensation would be triggered. The amount of payment still was to be predicated on the amount of spoils, measured by the cubic yard, that NEM recovered. This distinction is germane because of Twitchell's trial testimony that under the change order, the basis for payment was converted from volume of dredged materials to the amount of time for the dredge. Upon persistent examination on the issue, Twitchell ultimately acknowledged that the payment formula remained based on the volume of material that NEM dredged and that the City's payments to NEM were not a function of time alone. In evaluating his credibility on disputed matters, the court considers Twitchell's

equivocation of this fundamental aspect of the contract and his own proposed change order, which the City accepted and which thereby became part of the contract.

NEM accepted the City's proposed change to the payment scheme. *See* exhibits 75, 77. Made with NEM's full knowledge of the nature of the material to be dredged, this change reflects the parties' agreement on the compensation structure. The change order remained in effect for the balance of the first dredging season and for the entire second dredging season.

During the first dredge season, NEM ended up working for a total of 40 days.

### 3. End of first season through end of second season (January 2001-January 2002)

In July 2002, Twitchell advised City Manager King that NEM would begin the second season of dredging on November 1, 2002, after mobilizing for that work in late October. *See* exhibit 61. Twitchell also stated that NEM had obtained a second barge and would use a larger excavator. *Id.* In fact, NEM did not move any of its equipment to the harbor area until November 18. *See* exhibit 64. Twitchell testified at trial that he was not able to begin the dredging work when he planned, because Prock was also in the harbor working on the federal channel. However, when the City learned of this potential conflict in October, it initiated a meeting with ACOE representatives because it did not want NEM's work to be delayed. As Twitchell acknowledged, at the meeting, which was held on October 25, 2002, the City pressed ACOE on the issue, and ACOE ultimately agreed that NEM could begin its dredging operation on November 1. Although, both at trial and at the time, Twitchell blamed Prock's presence as the reason why NEM did not begin its work on November 1, the best evidence is that Prock did not pose such an impediment. *See, e.g.,* exhibit 65. In reality, NEM was not prepared to start on November 1 because it was in the process of repairing a barge. *See* exhibits 63, 64. At least some of the damage needing repairs occurred during the first dredge season, and at least by the summer of 2002 Twitchell had decided to put a new bottom on the vessel. He was still working on it in November and thus was unable to start at the time he had represented to the City.

NEM did not begin the dredging operation for the second season until November 26. *See* exhibit 72. When NEM got underway, the work went slowly. One contributing factor was a heavy layer of ice that formed in the harbor and in the dumping area. NEM was unable to break through the ice and in fact asked to City to solicit ice-breaking services from the Coast Guard. Contractually, however, it was NEM's responsibility to provide all equipment and services necessary to perform its work. *See* exhibit 32 at Bates 2318, 2345. Because of the slow progress, the City was able to secure an extension of the dredging season, enlarging the end of the season from mid-April to the end of that month. *See* exhibit 84. Nonetheless, the delayed commencement of work at the beginning of the second season caused NEM to lose time in the harbor prior to the onset of the ice.

For the second season, NEM used a different excavator. The new one had a "thumb," which made it easier to secure and then move bulky objects such as timber. It also had a larger capacity. The one used by NEM during the first season had a ¾ CY capacity; the successor could contain 2.5 CY in its bucket.

By the end of the 2002-03 dredging season, as calculated by the surveyor that NEM had selected, NEM had removed 9,662 cubic yards of spoils, when measured *in situ*. *See* exhibit 95b. This represented slightly more than 25% of the total amount to be dredged. These calculations are based on Plisga & Day pre-dredge survey and an interim survey that was conducted in mid-2003. *See* exhibits 95a-95d (surveys and meeting minutes). As of the end of the second dredging season, however, the City had paid NEM $266,082.75 -- more than half of the contract price. *See* exhibit 73a (payments for first season), 93a (payments through end of second season), 102b, 150a. This discrepancy was a function of the method by which the City made progress payments to NEM. Those payments were based on visual estimates of the amount of material that NEM dredged from the harbor area. As is discussed below, the dredged material expands in volume when it is removed. Therefore, the visual estimate of volume after the material is brought to the surface and loaded into a vessel tends to overstate the volume of material that would be measured *in situ*. Consequently, when viewed as a function of the overall amounts of material that NEM was obligated to remove and the total contract price, by the end of the second dredge season NEM had been substantially overpaid for the work it had completed up to that point.

NEM worked through the second dredge season pursuant to the January 2002 change order, which fixed the price per cubic yard that NEM dredged based on the amount of time NEM took to dredge that particular load. NEM did not raise any objection to that formula. As Twitchell testified at trial, by then NEM was aware of the nature of the materials in the harbor floor. Therefore, NEM operated under the change order, even as its work involved dredging and removing the timbers that led to the parties' agreement in early 2002 to adjust the way the payments due to NEM were calculated. And as is noted below, NEM expressed an intention to return for the third dredge season pursuant to the payment schedule embodied in the January 2002 change order.

No issues regarding the location of the City dredge arose during the second dredging season. In early December 2002, there was a slight change in the location of one of the coordinates that marked the federal channel. *See* exhibit 67. That one data point moved less than one foot and had no material affect on the City's project or the location of the dredge area.

### 4. End of second season through termination of contract and completion of dredge (April 2003-December 2005)

As is noted above, even prior the end of the second dredging season, NEM assured the City that it would return to the site and complete the dredging project pursuant to the change order to which the parties had agreed in January 2002. *See* exhibit 77. When the 2002-03 season ended, NEM requested the City to release amounts that, under the agreement, the City had retained and contractually was entitled to hold pending satisfactory completion of the entire project. *See* exhibit 90. The amount of that retainage was 10% of the payment otherwise due to NEM. *See* exhibit 32 at Bates 2292. NEM would have a claim to all or a portion of that retainage only when it had completed its performance under the agreement. *Id.* NEM based its request on its contention that it had finished a portion of the dredge project and therefore felt entitled to receive the retainage withheld for that part of the job. In its letter, NEM did not suggest that it felt entitled to receive the retainage because of the bulking effect of the material as it was dredged, which is discussed in more detail below. The City declined to give NEM those

13

retained amounts, largely because the payments it had made already to NEM were far in excess of the proportion of work that NEM was required to perform under the contract. Clearly, the City was within its rights to deny NEM the retainage at that time because the contract did not provide for an interim release of the retainage and because the City had overpaid NEM to date anyway. Nonetheless, NEM's very request for money it was not entitled to receive holds significance because, along with other evidence noted in this order, it demonstrates NEM's efforts to be paid in amounts exceeding its contractual rights.

Prior to a letter dated October 20, 2003, NEM provided no suggestion of any problem that would interfere with the dredging project that was set to resume for its third season. King had left the position of City Manager during the summer of 2003, and in October another municipal official wrote Twitchell to confirm that NEM would resume the dredge on November 1. *See* exhibit 100. The City needed that confirmation in order to prepare for that work. In response, Twitchell wrote back on October 20 and indicated, rather tersely, that there were "issues" that needed to be addressed, and he requested a meeting with dredge officials. *See* exhibit 101. This is the first notice NEM provided to the City about any problem affecting the upcoming dredge season. Such a meeting was held on November 10, *see* exhibit 102, which was ten days after the date when the third dredging season was to have begun. During the meeting, Twitchell raised two issues. First, Twitchell said that the dredging process caused the removed material to "fluff," or increase in volume. This meant that the amount of material NEM handled was in a greater volume than in its undisturbed state, and this in turn meant more work for NEM. The extent of bulking varied, depending on the nature of the material being dredged. The greatest extent of bulking occurred with spoils that included the timbers. Other spoils that were free from the timbers did bulk, but to a lesser extent than the materials that incorporated the timber and wood.

Tammy Pinkham, who also represented NEM, advised that the company could not afford to do this work because of the magnitude of the fluffing. *See* exhibit 102a. For the reasons noted above, because of the phenomenon by which the volume of the dredged materials increases during the dredging process, the City had substantially overpaid NEM for the work it had performed to date. NEM became aware of this

14

problem no later than the end of July 2003, when it was reported in the local media. *See* exhibit 95e. Nonetheless, it did not raise the issue until it sent the letter of October 20, and even then, NEM did not specify the nature of the problem it envisioned. Rather, NEM did not identify the issue in a meaningful way until the November 10 meeting.

The second "concern" of Twitchell was the difficulty NEM encountered in lining up a dredge inspector, who would be responsible for estimating the amount of material that NEM dredged as it progressed with its work. Those estimates are used to determine the amount of weekly progress payments paid to NEM. Under the contract, NEM bore the responsibility to secure a qualified inspector. *See* exhibit 32 at Bates 2353. NEM, in fact, had failed to pay the dump inspector who monitored the dredge earlier in the project. *See* exhibit 88. Ultimately, the City secured an inspector who was to work during the third dredge season. *See* exhibits 102b at Bates 1645; 196. (The City had to assure the new inspector that it would guarantee payment for his services, because NEM had not paid his predecessor.) Later, in December, after NEM was advised that the City had found an inspector for the third season, NEM indicated that it was able to find two others who would cost less. *See* exhibit 105.

At the November 10 meeting, the City instructed NEM to submit a written proposal to address the bulking problem. Such a procedure is required by the contract. *See* exhibit 32 at Bates 2329, 2332. However, as Twitchell acknowledged during his trial testimony, Pinkham later advised the City that NEM was not willing to so. Thus, because of NEM's refusal, W&C assessed the issue. Wilson, the W&C project engineer, then wrote to Twitchell on December 3. *See* exhibit 102b. In that letter, Wilson offered a detailed analysis of the fluffing effect and proposed an adjustment to the price of the contract based on that circumstance. The proposal would increase the amount of the contract price by approximately $20,000. That increase was predicated on the City's analysis of the dredging work associated with the removal of the timbers and the sediment in the areas where the timbers were embedded in the harbor floor. Under the City's analysis, the price it would pay for spoils in areas not affected by the timber material would continue to be controlled by the contract and the January 2002 change order. Wilson also reiterated the need for NEM to provide additional information and to submit its own proposed change order associated with the bulking issue because any

15

increases in the payment rate to NEM could require the City to reduce the amount of the dredge area in order to stay within the City's budget for the project overall. Wilson instructed NEM to reply by December 8.

By December 11, NEM had not responded to Wilson or the City. Wilson wrote Twitchell again. *See* exhibit 104a. That letter enclosed a change order that W&C itself had prepared, *see* exhibit 104b, even though the contract required NEM to create and submit the proposal. Based on the amount of material that NEM still had to remove, Wilson advised Twitchell that completion of the project by the end of the third dredge season would require it to remove two barge loads per day, six days each week.

As of December 15, NEM still had not submitted materials relevant to its complaint, and so a meeting with Twitchell was held that day at his insistence. *See* exhibit 105. The meeting was held on short notice. At the meeting, Twitchell contended that the City should release the retainage of approximately $25,000 to NEM, as it had previously requested in April; that the City pay NEM based on the volume of spoils after the spoils were dredged rather than *in situ* (in other words, based on its fluffed or bulked volume); and that the amount paid by the City to NEM to date be deemed full compensation for the work that NEM had performed to date and that the City would pay NEM in full for all future work without regard to the overpayments that the City had made to NEM already. As was described by Michelle Beal, the City's finance director and a participant at the December 15 meeting, the City viewed Twitchell's proposal as one that would repudiate the contract because it fundamentally deviated from the payment terms of the existing contract as modified by the January 2002 change order. Nonetheless, Twitchell was told that unless NEM made its own proposal to change the payment structure of the contract, the City would not be in a position to entertain the issue.

During the meeting, Twitchell also advised that NEM would not work six days per week, although NEM had failed to submit a proposed work schedule as the contract required and as the City had requested. At trial, Twitchell initially indicated that he was uncertain whether the contract required NEM to conduct the dredging work six days each week. As he ultimately acknowledged at trial, however, the original contract in fact requires NEM to work on the project six days per week during the dredging season. *See*

16

exhibit 32 at Bates 2344. Despite the contractual requirement obligating NEM to submit a proposed schedule, *see* exhibit 32 at Bates 2308-09, 2318, and despite repeated requests from W&C for such a schedule, *see, e.g.,* exhibits 36b, 42, 102a, 102b at Bates 1645, NEM never submitted one. Twitchell also told City representatives that because NEM was tied up with another project in Brooklin, it would not begin work in the harbor until some unspecified date in January. *See* exhibits 105 (indicating that Twitchell reported that NEM's other project was "behind schedule"), 109.

Significantly, of the issues that Twitchell raised at the December 15 meeting, neither he nor any other representative of NEM complained that the City dredge exceeded the terms of the dredge permits. As is discussed below, the City later sought an amendment to the DEP permit to address the quantities of material removed during the dredge and the relative location of the federal channel and the City dredge area. As part of its legal claim against the City and W&C, NEM contends that the governmental permit did not authorize the work that NEM was to perform under the contract. However, Twitchell did not make such an allegation at the meeting, and he did not offer any such concerns as a justification for NEM's failure to have resumed the dredge for the third dredge season. In fact, Twitchell was not aware of any such issue affecting the permit until January 2004, when he retained an engineer as a consultant to the project. *See* exhibits 114, 185.

In a letter dated December 19, Twitchell wrote to Wilson. *See* exhibit 107. In that letter, Twitchell advised that NEM could not begin dredging activities because of an overlay problem that, he suggested, raised questions about the location of the dredging area. As Twitchell described it in his letter, the overlay problem was the one that Wilson himself had brought up in his December 3, 2003, letter to Twitchell. *See* exhibit 102b at Bates 1645. In that letter, Wilson advised that he was going to explore the issue further with ACOE and Plisga & Day, but he also asked Twitchell for his "input" because NEM was responsible for coordinating the surveying responsibilities with Plisga & Day. As is noted above, NEM was responsible for locating the dredge area. And as is discussed further below, the overlay issue that Wilson noted in his December 3 issue ultimately arose from a change made in 2003 to the location of the federal channel. This issue was unrelated to the one that arose and was resolved during the first dredging season.

17

In his December 19 letter to Wilson, Twitchell also requested information about the pre-dredging calculations and probes conducted prior to the formation of the contract. Finally, Twitchell wrote, "Northeast Marine does not accept Woodard and Curran as the on-site engineer to measure and calculate loads. An independent engineer, shall be hired, agreeable to all parties involved. (no conflict of interest)." *Id.* In fact, under the contract, W&C was authorized to determine the quantity of work that NEM performed as the dredge progressed. *See* exhibit 32 at Bates 2327. Based on those measurements, W&C would then make recommendation to the City about the amount of progress payments that the City should pay to NEM. *Id.* at Bates 2336.

Twitchell wrote a separate letter of the same date, rejecting the City's proposal outlined in Wilson's December 11 letter and describing its own proposed changes in the contractual payment formula. *See* exhibit 108. In this second letter, NEM sought an additional amount in excess of $100,000 for work already done, even though under the existing contract, the City had substantially overpaid NEM for work performed to date. This additional payment included NEM's expenses for equipment and ice breaking, even though under the contract, NEM was responsible for all costs of materials and services necessary to perform the work. *See* exhibit 32 at Bates 2345. This can only include icebreaking work that might be necessary to allow NEM to continue the dredge. This means that the expenses of performance, such as icebreaking, are not compensable by themselves, and NEM could only recover such expenses through payments it received from the City based on the *in situ* volume of materials it dredged. Any separate payment for expenses of performance therefore would constitute a double payment. Additionally, as proposed in the December 11 letter, NEM requested an increase in the amount paid per cubic yard for future dredging. The proposed increase would have amounted to more than twice the *in situ* rates to which the parties agreed previously in the original contract, as modified in the January 2002 change order.

In a letter dated December 23, Wilson wrote Twitchell on behalf of the City formally advising NEM that the City rejected the changes that NEM had proposed to the payment structure. *See* exhibit 109. Wilson made it express that this decision triggered the dispute resolution procedures established in the contract, and he reminded Twitchell that under the contract, NEM was required to continue its performance under the contract

even while the dispute remained outstanding. Pursuant to the contract, W&C's rejection of NEM's December 19 proposal would be the final word on the matter, unless NEM appealed that rejection or requested dispute resolution. *See* exhibit 32 at Bates 2329. NEM did not take either approach, and it also did not sign or agree to W&C's proposed changes offered to NEM in the proposed change order dated December 11 (exhibit 104b).

In his letter, Wilson also informed Twitchell that, in the City's view, NEM was responsible for unreasonable delays in the resumption of the dredging project because it did not raise issues about the level of compensation within the time allowed by the contract. Under the contract, any request for relief must be made "promptly" but within no more than 30 days of the date a party learns of the basis for that relief. *See* exhibit 32 at Bates 2329. Wilson instructed Twitchell to provide a "realistic schedule" to complete the project, prior to NEM's resumption of the dredge. The contract required NEM to do this. *See* exhibit 32 at Bates 2339-40. (As is noted above, on several prior occasions, the City had requested NEM to provide a progress schedule.) As an additional condition to that resumption, Wilson also directed Twitchell to provide proof of an agreement that NEM was to reach to secure a dump inspector. Wilson advised Twitchell that the City expected NEM to comply with these conditions and mobilize in the harbor no later than January 15, 2004, and that failure to do so could be construed as a breach of the parties' contract. Finally, Wilson wrote that W&C would coordinate with NEM in preparing a "departure agreement with the City" in the event that NEM decided that it would not continue its work on the dredge project.

Several days later, Twitchell wrote to Beal and requested various information and documents, including data from the probes that W&C conducted in 2001 and information relevant to the pre-dredge survey. *See* exhibit 113. Twitchell imposed receipt of the pre-dredge survey information as a condition to NEM's resumption of the dredge, which he nevertheless stated would occur by January 15. Plisga & Day, however, had already conducted the pre-dredge survey, which would be used – and was used – to establish a baseline against which, with the use of a post-dredge survey, it would be possible to calculate the amount of material removed during the dredge. NEM itself had selected that surveying firm. In early January, NEM also retained an engineering firm to consult about the extent and location of the dredge. *See* exhibit 114.

19

On January 5, the City declared a breach and formally notified NEM that it demanded non-binding mediation to address the issues in dispute. *See* exhibit 163a. This procedure is required under the contract. *See* exhibit 32 at Bates 2346. Because the contract does not provide that the pendency of such a process tolls or suspends the contractor's obligation to continue its performance, the City maintained contact with NEM in anticipation that it would resume the dredging operation in January, as NEM represented it would do. On this basis, Wilson again wrote Twitchell with directions about which areas of the harbor should be dredged, in light of the fact that considerable time had passed without any progress. *See* exhibit 116. Wilson also reiterated the need for Twitchell to provide a proposed work schedule and for additional information.

As it turned out, the weather in mid-January, when Twitchell said he intended to resume work, was difficult. On January 28, Twitchell's attorney wrote Beal and asked for the City's assistance in securing the Coast Guard to break up ice that had formed in the harbor and in the dumping area. *See* exhibit 121. As is noted above, NEM – and not the City -- bore the responsibility to provide equipment and services necessary for the dredge. Counsel also suggested that the City delay the ice-breaking work, to avoid the possibility that the areas would freeze over again. The suggested delay was "a couple weeks," which would mean that NEM would not resume work until mid-February. Also in late January, NEM's attorney requested a meeting to discuss the issue regarding the locations of the federal and city channels and regarding whether the DEP permit accurately identified the location of the city dredge. *See* exhibit 185.

Such a meeting was never held. Instead, on February 4, 2004, the City issued a notice terminating the contract with NEM. *See* exhibit 123. As the contract authorized it to do, the City purported to terminate the contract for cause rather than for convenience, although the notice also provided that if the grounds underlying a termination for cause were insufficient, the notice should be construed as one terminating the contract for convenience. In that notice, the City recited five grounds for the termination: that NEM persistently failed to perform its obligations under the contract; that NEM did not perform in a timely way; that it disregarded the authority vested by the contract in W&C as the project engineer; that NEM did not submit information as required, resulting in further delays; and that NEM did not provide necessary equipment and personnel to

20

perform its obligations. In the notice, the City also demanded reimbursement of the money that it contended it had overpaid NEM for work performed to date.

After the City severed its contractual ties with NEM, it began the process of securing another marine contractor to complete the dredging project. In the end, it entered into an agreement with Prock to finish the work. In late 2005, Prock dredged the harbor area. At first, Prock used two 300 cubic yard capacity vessels (one dump scow and one flatbed barge), and then replaced the barge with a 500 CY capacity scow. Prock used an excavator with a bucket that held 6 CY of material. (NEM had began its dredge using a ¾ CY bucket and then used a larger, 2.5 CY bucket during the 2002-03 dredging season.) As is shown by the records of Prock's work, *see* exhibit 145d, and through the testimony of Prock's project manager, over the course of less than six weeks in November and December, Prock removed more than 19,000 cubic yards of material from the dredge area. In contrast to Prock's work, in the two seasons NEM carried out dredging work, NEM had removed less than 10,000 cubic yards. Prock did not remove all of the spoils that were the subject of NEM's contractual obligation, because under the contract it executed with Prock, the City's budget did not allow that much work, and because Prock dredged to a deeper depth (six feet below low water) than NEM was required to do (five feet). It bears note that the prospect of reducing the area of the dredge was something that existed even prior to the time the City entered into the contract with NEM. At the July 2001 pre-contract meeting between the City and NEM, the parties' principals discussed the possibility that if the dredging work was more difficult than expected and the cost of the dredge increased as a result, the City would reduce the scale of the dredge project in order to remain within budget. *See* exhibit 30b.

In the permit that the Maine Department of Environmental Protection had issued to the City in December 1999, the agency authorized the City to dredge in both intertidal and subtidal areas in and near the municipal harbor. Under the contract, the City was responsible for obtaining all permits that were necessary for the dredge project. *See* exhibit 32 at Bates 2345. With respect to the intertidal area, the permit authorized the City to dredge 2,000 cubic yards of sediment from an area of 13,750 square feet, which is approximately .3 acres. *See* exhibit 12. In May 2000, through correspondence with ACOE, the city identified three areas within the intertidal zone where it planned to

21

dredge. *See* exhibit 13. *See also* exhibit 210. Those areas were located across from the town dock (9,600 square feet, or .22 acres); the northwest corner of the dredge area (1,300 square feet, or .03 acres); and the area near Card's Cove (15,300 square feet, or .35 acres). Put together, these three intertidal areas constitute 29,500 square feet, or approximately .6 acres, which is twice the dredge area approved by DEP.

The discrepancy between the area estimates communicated to DEP and later to ACOE resulted from the omission of the Card's Cove area as a section of intertidal land. Card's Cove was within the overall dredge area allowed by DEP, but in its permit application, the City viewed this area as subtidal. In fact, as it later learned, Card's Cove was intertidal. Nevertheless, the City proceeded with the dredge project on the basis of the DEP permit issued in 1999, which included Card's Cove as a subtidal portion, rather than intertidal portion, of the dredge area. W&C did not seek to amend the permit because whether Card's Cove was subtidal or intertidal, it was within the boundary of the permitted dredging area, and W&C believed from prior experience that the matter would not be of significance to DEP. Prior to the time the City terminated the contract with NEM, NEM never raised the issue and never expressed an intention to terminate its work because of a claim that the City had not secured a permit that would authorize all work required under the contract. In fact, as Twitchell testified, NEM was not even aware of this permit issue until sometime in January 2004, when it retained an engineer regarding its work on the project. Rather, the issue came up in a March 2004 letter sent to NEM's attorney by Stacie Beyer, the DEP representative who was involved with the dredge project. *See* exhibit 124. Beyer's letter responded to a letter that NEM's attorney had sent her. It does not appear that the record includes counsel's letter, and thus it is unclear whether counsel raised the issue in his letter or whether Beyer herself raised it as part of a discussion about the dredge project boundaries.

Nonetheless, in February 2005, W&C sought a modification of the DEP permit, so that the permit would cover the additional volume of intertidal sediment and the additional area from which that sediment had been removed. *See* exhibit 141a. The modification would allow the removal of 7,050 CY from an intertidal area of 35,950 square feet. DEP granted the modification. *See* exhibit 141b, 186. The modification order noted that the amended permit did not affect the dredge boundaries. DEP issued its

amended permit after the intertidal area had been dredged. Thus, the amended permit was retrospective (i.e., after the fact, or "ATF"). Although Beyer's March 2004 letter to NEM's counsel did note the importance of adhering to the limits established in the original permit, a year later DEP readily amended the permit to allow the intertidal dredging work that had already been performed because, as expressed in the order, the work at issue had not breached the boundaries of the City dredge; because it actually decreased the amount of subtidal dredging; and because it did not create any environmental problems. As the DEP characterized it in its amended permit, the change was "minor."

DEP's favorable treatment of the City's request for a modification to the dredge permit corroborates the testimony of Michelle Beal, the City's finance director who also served as the acting city manager in later 2003 and early 2004, after King left. Because of the issues raised by NEM and its counsel earlier in 2004, the City wanted to meet with Beyer to determine if a problem actually existed. Beal and Beyer met in September 2004. The meeting was brief, because Beyer told Beal that she (Beyer) was aware of the issue. Beyer took the position, later embodied in the modified permit, that so long as the City dredge did not breach the outer dredge boundaries set in the original permit, DEP was not concerned with any deviation from the terms of the project as allowed by the permit. In fact, despite DEP's awareness of the issue even prior to the meeting between Beyer and Beal, the agency had not taken any enforcement action, and it did not even communicate a concern to the City about the issue. Indeed, the City sought the amended permit on its own initiative, rather than at DEP's suggestion.

In the middle of September 2003, Plisga & Day updated the survey of the City's channel and of the dredging work that NEM had performed to date. As part of that process, Plisga & Day requested and received information from ACOE about a new survey it had commissioned. *See* exhibit 98. That information included coordinates of the boundaries of the federal channel in the area of the City dredge. *See id.* The location of the federal channel was significant to the City's project because, as is noted above, the location of the latter was a function of the former. After receiving this information, Plisga & Day prepared a new survey map. *See* exhibit 99. As part of its analysis of the bulking factor that NEM raised in late 2003, W&C obtained the updated Plisga & Day

survey, and, Wilson (W&C's project manager) testified, he then recognized that the location of the federal channel appears to have moved from the location used in 2001. *See* exhibit 141a (referring to a "change" in the location of the federal channel). Federal authorities are authorized to change the location of a federal channel, and in fact they do so. *See also* exhibit 119 (demonstrating that the location of the federal channel is subject to occasional changes so as to enclose the deepest depths within the channel). The change that arose from the 2003 survey was a separate issue from the one that arose in December 2001. As is discussed above, that earlier problem arose because Plisga & Day was not provided with the coordinates set out in the federal survey (C-7), which was the touchstone for locating the City dredge.

The best evidence reveals that these boundary data that W&C received in 2003 did not have the effect of changing the location of the outer boundaries of the area that DEP authorized for the City dredge. Rather, the apparent changes in the location of the federal channel could have affected the common boundary of the federal channel and the City dredge area. However, the City dredge area essentially surrounded the terminus of the federal channel, and so any movement of the City-federal boundary did not constitute a deviation from the outside perimeter of the City's dredge area. In its February 2005 application for a modification to the original DEP permit, Wilson explained this situation to Beyer. *See* exhibit 141a. DEP recognized and acknowledged the situation and still issued the amended permit because there was no change in the outer boundary of the combined federal/City dredge area. *See* exhibit 141a, 186.

Despite Twitchell's occasional uncertainty about the location of the City dredge project at the beginning of the first dredging season and the 2003 change in the location of the internal federal-City dredge location, the evidence establishes that all of the dredging work that NEM performed in the City dredge area was within the permitted location and that NEM did not exceed the boundary created in the DEP permit.

**B. Discussion and conclusions of law**

NEM has asserted claims against the City and W&C for breach of contract (count 1). It also has set out a claim for recovery of damages from the City, associated with its contention that the City terminated the contract for convenience, rather than for cause

(count 4).[4] The City has asserted a counterclaim against NEM for breach of contract (count 1 of the counterclaim) and for unjust enrichment (count 2 of the counterclaim). The court will consider these claims separately.

### 1. NEM's claims against the City

NEM argues that the City breached the dredging contract in three ways: first, by failing to secure a permit that would allow NEM to perform under the contract; second, by failing to correctly identify the location of the City dredge; and third, by failing to disclose the nature of the material that NEM would be contractually required to dredge. The court concludes that NEM has not proven that the City is liable based on any of these claims.

### (a) Sufficiency of the dredge permit

NEM argues that the permit issued by DEP to the City did not allow it (NEM) to perform the dredge work required by the contract. Under the contract, the City was required to obtain a permit that would authorize the contracted dredge work to be done. NEM argues that the DEP permit was deficient in two ways: first, that the permit only allowed the City to dredge 2,000 CY of sediment from intertidal areas within the City's overall dredge boundaries; and second, that the permit allowed the City to dredge .3 acres of intertidal habitat. NEM's argument correctly states the terms of the permit's restrictions. After the City obtained the DEP permit, it learned that the intertidal aspect of the project exceeded both limits. The court nonetheless concludes that even if the City failed to comply with its contractual obligation to obtain a permit that authorized the extent of dredging in the intertidal areas of the City's dredge area that was actually done, any such breach was not material.

The Law Court has defined the distinction between a total breach and a partial breach of a contract:

> When one party breaches a contract, the nonbreaching party may, depending on the circumstances, either treat the breach as partial or total. A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end . . . If [the]

---

[4] In its complaint, NEM also alleged that the City and W&C are liable for both fraudulent and negligent misrepresentation (counts 2 and 3). Prior to trial, the court entered summary judgment for the defendants on those two counts, leaving the claims noted in the text.

breach is not sufficiently material and important for this, the breach is called a partial breach. If a party elects to treat the breach as partial, however, it must still perform its obligations in order for it to avoid also breaching the contract.

*Down East Energy Corp. v. RMR, Inc.*, 1997 ME 148, ¶ 10, 697 A.2d 417, 421. For purposes of this discussion, the court assumes that the City committed a breach of the contract when it failed to obtain a permit from the Maine Department of Environmental Protection that did not fully conform to the actual dredging project due to the two deviations noted above.

The magnitude of any such breach – and the legal effects flowing from it – is best gauged by the DEP's response to the City's application for an amendment to the original permit. The requested amended permit was to reflect the work that was actually performed in excess of the originally permitted dredge work. For that reason, it was to be an ATF (after the fact) authorization. Perhaps through communications with NEM's attorney after the City terminated the contract, DEP became aware in early 2004 that the volume and area of intertidal dredging exceeded the limits established in the original permit. Even when armed with that information, the agency did not take any steps to intervene in the dredge project either through an enforcement action or with a simple communication to the City advising it of a problem. Later in 2004, Beal, as a city representative, took the initiative to meet with Beyer, the DEP agent involved in the project, in order to discuss this very issue. Beyer assured Beal that the agency was not concerned about the deviation. This perspective was subsequently embodied in the amended permit issued by DEP in 2005. Among the findings that the agency articulated to explain its decision to grant the amended permit, it characterized the intertidal boundary and volume issues as "minor."

From this, the court concludes that any breach by the City was a partial breach. Under the *Down East Energy* formulation, the breach would not justify a refusal by NEM to perform its obligations under the contract. More importantly, however, NEM did not invoke any deficiencies in the permit as a basis for non-performance. Rather, as is discussed at greater length below, NEM's intransigence in performing its obligations in late 2003 was ultimately rooted in its efforts to secure higher level of payment from the City for work that it was already required to perform. NEM was not even aware that the

26

permit may not have covered the proposed dredge work until early January 2004, when it retained independent engineering services.

Further, any such breach did not cause NEM to sustain damages. There were no resulting delays in NEM's ability to work on site. Rather, NEM had declined to resume its dredging work for unrelated reasons. Further, DEP did not seek any sanction from any party to this action. NEM therefore was not exposed to penalties or other consequences from any work that exceeded the limitations imposed in the original permit. Therefore, NEM did not sustain any harm or prejudice because of any work it performed beyond that authorized in the DEP permit, and consequently it has not proven any damages arising from a breach of contract.

**(b) Location of the City dredge**

NEM's contention that the City breached the contract in this second way must be predicated on an argument that the City did not provide it with sufficient information on which it (NEM) could adequately establish the location of the City dredge project on the face of the earth. This analysis is necessary, because under the contract, the City was obligated only to provide NEM with reference points or other information that NEM could then use to locate the City dredge area. Under the contract, W&C's involvement on this issue was to assess whether the data provided by the City would allow NEM to map out the location of the project.

On this record, there is no meaningful dispute that the coordinates for the federal channel are a sufficient basis for locating the City dredge area. The City dredge area was intended to compliment and coordinate with the federal channel, and so once the federal channel is located, the location of City dredge area could be determined. The location of the federal channel is defined by the coordinates or reference points set out in the C-7 survey. This means that because the City and W&C provided NEM with the C-7 survey, they discharged their contractual responsibility. The remaining task of establishing the location of the City dredge area as a function of the C-7 coordinates was NEM's obligation.

NEM argues that there was a ongoing question about the location of the City's dredge project throughout the duration of NEM's participation in it. However, the evidence reveals that there were two distinct episodes that arguably raised questions

27

about the City dredge boundaries. Neither amounts to a breach of the contract attributable to the City. The first occurred in late 2001, when NEM began the dredging work. Although Twitchell disputes it, the preponderance of the evidence indicates that NEM had been provided with the C-7 survey even prior to the beginning of the dredge season. Even Twitchell agrees, however, that he received that document and the accompanying information by December 19, 2001. Nonetheless, the record also establishes that the surveying firm, Plisga & Day, did not come into possession of that information until later. This meant that earlier in December, when the surveyors were attempting to locate the City dredge area, they did not have the benefit of information that would be instrumental to that task. Instead, Stan Plisga had to try to align several surveys in order to define the dredge area. Within the first few weeks of the dredging operation in late December 2001 and early January 2002, Twitchell went back and forth on the question of whether he was satisfied with the information that Plisga & Day produced. Ultimately, however, Plisga & Day acquired the information from the federal survey, and Twitchell indicated that he knew the location of the dredging boundaries and was satisfied that he was working within them. Indeed, surveys that were conducted after the second dredging season, which was after NEM had performed all of the dredging work that it ended up providing to the City, establish that NEM conducted its dredge fully within the boundaries of the project. This tends to confirm that, instead of having received faulty data, NEM actually had correct information about the project's location and then used that information effectively.

Separate and distinct from this episode, in 2003 W&C discovered that the federal channel had been re-located. Despite NEM's argument that this was not a new development but rather constituted a problem that existed throughout the time it worked on the project, the court concludes that the better evidence establishes that questions about the location of the federal channel – and thus of the City's dredge area – were generated by a federal survey conducted in 2003, which indicated that the location of the federal channel had changed since 2001. W&C came across the new date as Wilson, a W&C project manager, examined the bulking issue that was the focus of NEM's reluctance to resume its dredging work. As part of that process, he analyzed the new surveys that contained information about the amount of material that NEM had dredged

28

to date. It was these surveys that also revealed information about new federal coordinates. When Wilson came across this information, he advised Twitchell about it in his December 3 letter. Twitchell, on the other hand, had not raised any question about the location of the City dredge area since January 2002, when he became confident that NEM was dredging in the correct area after Plisga & Day was provided with the federal coordinates from the C-7 survey.

The revelation of the new federal data in 2003 cannot be viewed as a breach by the City of its contractual obligation to provide NEM with information that would allow it to locate the dredge grounds. The City had just come across that information unexpectedly and was in the process of evaluating it, when other factors led the City to terminate the contract in early January 2004. Therefore, even if the new federal reference points constituted a modification of the terms to the original contract because of its effect on the location of the City dredge area, then the City did not breach its corresponding obligation to provide those data to NEM.

(c) Nature of dredged materials

Almost immediately after NEM began the dredging work in December 2001, it found that the dredge area was the site of timbers. This had not been fully revealed in the information that the City, through W&C, had provided to NEM and other prospective contractors. Timbers posed a considerable problem for NEM because of the equipment it had brought to the dredge site. The bucket on the excavator was relatively small and thus could not easily capture objects such as timbers, unlike more typical spoils such as sediment that could be scooped up more easily. Additionally, the timbers were difficult to load onto the barge that NEM used to transport the material to the dumping ground.

This type of complication was certainly not unforeseeable or unforeseen. In its bid proposal, NEM acknowledged that if the material in the harbor made the dredge more difficult than the parties expected, it expected to be able to renegotiate the price per cubic yard that it would be paid. Additionally, even the standard form portion of the parties' actual contract opened the door to price renegotiations in this circumstance. Thus, it is plain from the record that in the marine dredging business, once a dredge operation gets underway, it is not uncommon for the dredging contractor to encounter spoils that enhance the difficulty of the dredging operation. That was the situation here.

29

The City promptly learned of the difficulty that NEM had begun to encounter in December 2001. The parties conferred, and at the City's recommendation, NEM followed the procedure established in the contract to propose a change order that would adjust the amount of money that the City would pay to NEM due to the increased difficulty. The City responded to NEM's proposal, and NEM accepted the City's proposal. The court concludes that the resulting modification of the price structure in the original contract represented a dispositive, final and informed accommodation of the problem. In other words, once NEM was in the harbor and found that it would be required to dredge materials that were different from what the parties had anticipated, the parties responded with an adjustment that fully accounted for that new information. Because NEM agreed to this resolution, it cannot be heard now to complain that the City had breached the contract by failing to provide the very information that formed the basis for the parties' accord.

To the extent that NEM is also alleging that it was harmed by the presence of materials in the harbor floor other than the timbers, this argument also fails. When NEM sought a substantial change in the payment formula in November and December 2003, it contended that the increase in bulk of the dredged material correspondingly increased the amount of work it would have to do. The effect of the timber on this "fluffing factor" had been resolved with the January 2002 change order. This would leave only the bulking effect of the other spoils in the dredge area. Nothing in the record suggests that bulking of the non-timber material upon dredging is an unforeseeable and unexpected phenomenon. Indeed, common sense suggests that this will happen. Therefore, there is no basis on which NEM can argue that the City can be charged with any lack of awareness of spoils material other than the timbers.

Even if the City were at fault in some way because it failed to disclose material that bulked more than the parties could have expected, NEM has not preserved any claim for relief here. In late December 2003, after considerable prodding, NEM submitted a proposed change order to address the bulking factor. The City rejected that proposal. Under the contract, that rejection became final unless NEM pursued an appeal or some other form of recourse, such as mediation, prescribed in the contract. NEM did not take any of those steps that were available to it. Consequently, it became bound by the City's

30

rejection of its proposed change order, which meant that the existing pricing formula – which included the change order to which NEM itself had agreed in January 2002 – remained in place. Because that pricing arrangement remained unchanged, the City cannot be deemed to have breached the contract.

### 3. NEM's claims against W&C

In NEM's count that remains against W&C, NEM alleges that it is liable for breach of contract. As is noted in the summary judgment order, NEM's remaining claim against W&C is limited to its contention that W&C failed to provide NEM with clarifications and interpretations as required by the contract. This claim requires proof that W&C was a party to the contract, because otherwise W&C would not owe an independent contractual duty to NEM.[5]

W&C was not a party to the contract. The only parties to the contract were NEM and the City. The contract expressly identifies W&C as the City's agent, and W&C held itself out in that capacity throughout its work in the case. Because the contract fully disclosed the existence of the agency relationship between W&C and the City, W&C cannot be deemed a party to that contract. *See* RESTATEMENT (THIRD) OF THE LAW OF AGENCY § 6.01 (2006); RESTATEMENT (SECOND) OF THE LAW OF AGENCY § 320 (1958). An exception to this general principal exists where the agent and the third-party (here, NEM) agree that the agent is a party to the contract. *See* RESTATEMENT (THIRD) OF THE LAW OF AGENCY § 6.01(1). The third-party bears the burden of proving such an agreement. *See id.* at cmt. d(1). NEM has not argued that W&C entered into an agreement with it (NEM) under which W&C would become a party to the contract, and such an argument would not have support in this record. As the Restatement notes, "[a]n agent is not a party to a contract if any portion of the parties' writing makes clear that the agent acts solely in a representative capacity on behalf of a disclosed principal." *Id.* That is the case here: the contract expressly designates W&C's role as that of the City's agent.

---

[5] NEM does not argue that it is a third-party beneficiary of the contract between the City and W&C under which the W&C had a separately enforceable duty to provide engineering and other services associated with the dredge project. Although W&C has offered an argument against such a contention, NEM does not pursue it as a theory of liability, and so the court does not reach it here.

31

The contract also addresses the extent of any liability to which W&C would be exposed on account of its work as the project engineer. Under its terms, W&C is immunized from any claims based on decisions and actions made in good faith. Simply put, NEM has not established that W&C acted in a way that fell short of good faith in any aspect of its role. As is discussed further below, W&C and the City gave NEM considerable opportunity to perform under the contract. They were tolerant of repeated material delays, and even when NEM declined to resume the third season dredge, W&C and the City showed considerable patience with the contractor.

NEM has argued that the City did not adequately disclose the intertidal aspects of the dredge project to DEP when it sought the agency's permit. As is discussed above, it appears that prior to the execution of the contract and the commencement of the actual dredge work, W&C and the City knew or should have known that with respect to the intertidal dredge the quantitative information in the permit application, and thus in the terms of the permit itself, was inaccurate. However, the DEP representative ultimately concluded that the inaccuracies were "minor," and the DEP issued the amended permit that brought those deviations back within the allowable scope of work. Thus, because this was not a significant issue, and because the problem did not create any harm to NEM, any failure by W&C to clarify the issue with the agency prior to 2004 did not fall short of good faith performance of its own obligations as the City's agent, and it did not result in any independent liability or harm to NEM.

### 3. City's claims against NEM

In its counterclaim against NEM, the City alleges that it terminated its contract with NEM for cause and that it is entitled to recover damages pursuant to the formula for relief set out in the contract. In a separate count, it also seeks recovery for overpayments it made to NEM during the course of the dredging operation, framing this issue as one for unjust enrichment. The court concludes that the City was entitled to terminate the contract for cause and that the rights and responsibilities of the City and NEM are determined both pursuant to the remedial terms of the contract associated with such a termination and under common law principles.

The contract authorized the City to terminate the contract for cause in any of four circumstances. *See* exhibit 32 at Bates 2340. The contract describes one of those circumstances in the following way:

> 1. CONTRACTOR'S persistent failure to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment or failure to adhere to the progress schedule. . .as adjusted from time to time. . .). . . .

*Id.*

The City has established by a preponderance of the evidence that NEM persistently failed to perform its obligations under the contract in accordance with those contractual requirements. NEM's persistent failure to satisfy its contractual performance culminated in its effective refusal to resume dredging operations in the third season, after it unjustifiably delayed making the complaints about the terms of the agreement. The events of 2003, however, must be seen in light of significant but less determinative circumstances that arose during the first two dredging seasons. The contract authorized the City to terminate for cause only if NEM's failure to perform under the contract were "persistent," thus making those prior circumstances relevant.

In the contract, NEM acknowledged that time for performance was "of the essence." NEM agreed to substantially complete its performance by April 1, 2002, which turned out to be the end of merely the first dredging season. Further, the contract required NEM to work six days per week. As late as December 15, 2004, – more than two years after NEM entered into the contract --, NEM appeared to have been unaware of this requirement, and Twitchell actually told City and W&C representatives that he would refuse to work on that schedule.

In July 2001, Twitchell represented that NEM would begin work at the end of October, which was when the permitted dredging season began. However, the City had no further contact from NEM until a City employee initiated contact with NEM in late October. The absence of any communication from NEM by itself delayed the start of the dredge, because the City needed several weeks advance notice of that start date in order to make arrangements for that work to begin. As of the beginning of November, however, NEM had not arranged for a pre-dredge survey, and at the pre-dredge meeting held on November 7, Twitchell seemed unaware that, despite the plain requirements of

33

the contract, he was responsible for securing that survey. This caused an additional delay, despite the City's efforts to help NEM secure a surveyor. Even if NEM had arranged for the survey, it could not have begun the dredge on a timely basis because its tug needed repairs. The dredge finally began on December 19, more than a month and a half late.

Once it was underway, the dredge progressed slowly during the first season because NEM found that the harbor floor contained timbers, which made the dredging work more difficult. None of the parties anticipated this situation, despite the probing analysis that W&C had conducted even prior the time NEM and the City entered into the agreement. Because this problem was unexpected, the resulting delays during the first dredge season after that point cannot be charged to NEM. Nonetheless, these events reveal the beginnings of a pattern of delay.

This pattern continued into the second season. In response to the slow pace that characterized the first season, NEM obtained a second barge and a larger bucket for its excavator, which also could move timbers more effectively. And in July 2002, NEM advised the City that it would commence work on November 1, 2002, which would be the first day that dredging could be performed. However, NEM was not prepared to start on that date because its barge was still under repairs for damage that, at least in part, occurred during the first dredging season. NEM has not offered a satisfactory explanation why, when the barge was damaged well prior to November 2002, the repairs were not completed in time for the dredge to begin then as scheduled. It is significant that at trial, Twitchell attempted to blame the presence of the federal dredging contractor, Prock Marine, in the harbor as the explanation for NEM's late start. However, as Twitchell ultimately acknowledged and as extrinsic evidence establishes, NEM was fully aware that it could have worked in the harbor at the same time as Prock.

NEM ultimately began dredging the harbor for the second season in late November. By then, it had lost nearly a month of valuable time to work. It had to suspend operations for part of the winter because the harbor froze over. This compounded the effects of the delay in November, because NEM became unable to make up lost ground. NEM's lack of access to the dredge area also has significance on another aspect of its failure to perform. Under the contract, NEM was required to provide

34

suitable equipment that would preclude a persistent failure to perform. NEM was unable to work through the second season because it could not break up the ice in the harbor. The same problem would have arisen during the third season, as would be demonstrated by NEM's January 2004 request for the City to arrange for icebreaking services.

The end of the second season represented the last of NEM's work in the harbor. As is noted above, some delays in NEM's progress during the first season were understandable because of the unexpected encounters with the timbers among the dredge spoils. However, NEM was fully aware of this issue when it began the second season, and in fact, by securing more suitable equipment, it had taken steps to prepare for dredging that material. Nonetheless, despite the absence of surprises, by the end of the second season, NEM had completed barely more than one-quarter of the work required under the contract. The court attributes this to the delays and lost work opportunities that NEM created during the first two seasons. Additionally, because the harbor floor was now a known quantity, the slow progress must also be seen as a reflection of insufficient resources that NEM was dedicating to this project. As will be seen, this point is clearly demonstrated by the effectiveness of the dredging work that Prock performed after NEM was terminated from the project.

NEM's willingness to perform under the contract shifted in a fundamental way sometime between February 2003 and October 2003. This change embodied a persistent failure to perform, thus justifying the City's decision to terminate the contract in February 2005. By letter sent in early February 2003 to Timothy King, the City manager, Twitchell provided assurances that NEM would return to the harbor in the fall and resume work at that time and that it would continue the work pursuant to the existing agreement. NEM had no contact with the City or with W&C until Twitchell responded to a letter sent to him by King's successor in October. In that letter of October 20, Twitchell reported that there were "issues that need to be resolved before the dredging will resume." This raises the question, what happened between February and October that prompted NEM to threaten a termination of its work? The court finds that in the interim, through media accounts of the dredge project, NEM became aware that the City had overpaid NEM for work performed to date. As is discussed above, this was caused by the method of calculating the progress payments that the City made to NEM. Those

35

payments were based on visual estimates of the amount of material that NEM removed from the harbor. Because the *in situ* volume is less than the volume after the spoils are dredged, it had appeared that NEM had performed more work than it actually did. Because NEM was paid based on the volume of dredged material, the City ended up paying more than NEM had earned under the contract.

NEM's realization of the financial status of its work explains its responses in November and December 2003. The focus of those substantive concerns as expressed to the City and to W&C was on the amount of money it was to be paid for its work. Although in February 2003 NEM expressed full willingness to work under the existing contractual payment formula, by the end of that year NEM had made a demand for a huge increase in the amount of those payments and for payments of expenses for which, under the contract, it was responsible – even though there had not been any change in the project or working conditions since NEM had sent its letter in February 2003 stating its intention to return to the harbor under the contract.

Several aspects of NEM's demands justified the City's termination of the contract for cause. First, at best for NEM, NEM's dissatisfaction with the existing payment terms arose in July 2003, when local media reported the fact that the City had overpaid NEM. Under the contract, NEM was required to put the City on notice in writing of any dispute "promptly" after the grounds for the dispute arise, but within no more than 30 days. This means that if NEM did not know of the overpayment until July, it was required to notify the City of a resulting dispute by August. Instead, NEM waited more than two months after that contractual deadline. This resulted in a material delay in the project: because NEM raised the issue on the cusp of the beginning of the third dredge season, valuable time was lost during that season. That NEM waited as it did justified the City in concluding that NEM did not intend to adhere to its performance obligations.

In fact, at least part of the basis for NEM's dissatisfaction with the payment terms rests on the bulking factor caused by the timbers. This problem became apparent when NEM first began its dredging work in December 2001. To this extent, NEM was not entitled to ground a claimed dispute on the timbers, because it failed to raise the issue in a timely way and because, just as importantly, the parties fully addressed and resolved this issue through the January 2002 change order. Beyond this, to the extent that the bulking

36

issue that NEM raised in October 2003 was based on the bulking of spoils other than the timbers, NEM must have been aware of that issue as it conducted the dredge of the harbor during the first two seasons. Therefore, the basis for the dispute referenced in Twitchell's October 2003 letter had been known to NEM for a considerable length of time. As is noted immediately above, the contract required NEM to communicate a dispute to the City at least by August 2003. However, because the basis for that complaint was evident well prior to July 2003 (when the media reported the overpayments), NEM's complaint first articulated in October 2003 may have been even more untimely.

Additionally, when the parties' principals met on November 10, Twitchell was instructed to submit a proposed change order reflecting a new payment formula that it felt would address its complaint. This is the procedure required by the contract, and it is the same procedure that, on W&C's suggestion, NEM followed in January 2002 when the parties recognized that the timbers buried in the harbor floor would warrant an adjustment of the payment terms. Despite this and subsequent requests for a proposed change order, NEM did not submit one until December 19. At one point in the interim, a NEM representative, Tammy Pinkham, told W&C that NEM would not provide a change order. In the face of this, W&C prepared one on behalf of the City for NEM's own consideration. In addition to revealing NEM's own refusal to perform under the contract, these developments demonstrate the extent of the City's willingness to go beyond its own responsibilities under the contract in an attempt to save the contractual relationship with NEM.

When NEM did provide the City with a proposed change order, W&C promptly evaluated it, and the City promptly rejected it. When W&C notified NEM of this action, it also reminded NEM of NEM's recourse under the contract, which consisted of an appeal or demand for dispute resolution. NEM did not invoke either of these procedures, which meant, as W&C also noted in its rejection advice, that the contract would remain in effect without change. Nonetheless, NEM still refused to resume its dredging operation.

As these events were progressing, NEM provided even further evidence that it did not intend to attach importance to the timeliness of its performance. First, at a meeting

37

held on December 15, Twitchell advised that NEM did not intend to work in the harbor six days per week. In a letter that Wilson sent previously to Twitchell, W&C projected that based on the amount of material that still needed to be removed from the harbor, NEM would need to use two barges six days per week to complete the dredge during the third season. Twitchell's refusal to submit to that proposed work schedule contravened the terms of the contract. However, it also left open the question of how NEM itself intended to complete the dredge job. Twitchell rejected W&C's proposed schedule, but it did not propose any alternative. Indeed, W&C had requested NEM to provide a progress schedule a number of times. Despite these requests and the contractual requirement, NEM never did so.

NEM's failure to resume the City dredge project for the third season resulted from another reason unrelated to the terms of the contract. NEM was working on an unrelated job and thus was unavailable to return to the harbor anyway. Twitchell advised the City that this diversion would continue into sometime in January 2004. Then, in January, after the City had declared a default but prior to its termination for cause in early February, NEM's attorney advised the City that because of ice conditions in the harbor, NEM could not dredge. Counsel suggested that because of anticipated weather conditions, NEM could not be expected realistically to begin its work until mid-February.

The evident effects of NEM's refusal to return to the harbor were compounded by the pace of the work performed during the first two seasons. Despite its presence in the harbor for two winters, it had removed only approximately 25% of the material that was involved in the project. The slow pace during the first season was justified because of the problems removing the timber. However, NEM was on notice of that issue for the second season and prepared for that known condition by obtaining different equipment. Despite this, NEM remained unable to accomplish much of the work required by the contract. The inadequacy of the resources that NEM brought to bear are shown not only by this slow rate of progress, but by the manner in which Prock, as the successor dredging contractor, accomplished the work that the contract required NEM to perform. In less than two months (i.e., roughly one-third of a single dredging season), Prock removed approximately twice the amount of spoils that NEM had dredged in two seasons. Even if one were to allow for the possibility of differing work conditions (if, for

example, the areas that Prock dredged were not encumbered by timbers – although Prock did fact some unique difficulty because it encountered boulders, *see* exhibit 263), the court views this as powerful evidence that a properly equipped and staffed dredging contractor would be fully capable of dredging the harbor expeditiously.

Thus, when NEM balked at resuming its work for the third season, the City then began to lose even more time on the project by a contractor whose work progressed very slowly even when it was performing. The history of unjustified and improper delays, aggravated by the slow pace of progress, established that NEM had engaged in a persistent failure to perform its work under the contract. For the reasons set out in the discussion of NEM's claims against the City, NEM's failure to perform was not legally justified. The court concludes that NEM was simply not equipped to manage this project. NEM submitted a low bid for the contract, attempting to present a more attractive proposal than the one it knew Prock had submitted previously. NEM began the project late and then ran into unexpected problems with the timbers. However, the parties, now aware of the problem, addressed it and agreed to an accommodation. Despite the additional knowledge about the harbor conditions, NEM still was overmatched by the project. In April 2003, NEM requested the City to turn over the retainage of approximately $25,000, to which it had no present claim under the contract. Then, by July 2003 when NEM learned that it had been paid more than it was entitled to receive under the contract and thus might owe money back to the City for work performed to date, the company took a hard line in an attempt to effect an extraordinary increase in the compensation structure. This included retaining the overpayments, increasing the level of future payments, and receiving reimbursement for the expenses of its work. The City rejected that proposal; NEM did not seek any relief from that position; NEM did not resume the dredge; and the City formalized the end of the relationship through notices of default and termination for cause.

For these reasons and without reaching the other grounds urged by the City in support of its claim for breach of contract, the court concludes that NEM committed a material breach of contract and that is liable to the City for damages.

This leads to the question of damages arising from the City's termination of the contract for cause. The contract identifies the elements and measure of damages when the contractual relationship comes to an end under those circumstances:

> If the unpaid balance of the Contract Price exceeds all claims, costs, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute alternative costs) sustained by OWNER arising out of or relating to completing the Work, such excess will be paid to CONTRACTOR. If such claims, costs, losses, and damages exceed such unpaid balance, CONTRACTOR shall pay the difference to OWNER. . . .When exercising any rights or remedies under this paragraph OWNER shall not be required to obtain the lowest price for the Work performed.

> . . .Where CONTRACTOR'S services have been so terminated by OWNER [for cause], the termination will not affect any rights or remedies of OWNER against CONTRACTOR then existing or which may thereafter accrue.

*See* exhibit 32 at Bates 2340.

The total contract price was $516,022, which includes the increased payments to NEM based on the adjustments to the payment formula established in the January 2002 change order. *See* exhibit 104b. Of this amount, the City paid NEM $266,083. *See* exhibit 150a. The unpaid balance is the difference between the two, or $249,939. This figure, representing the amount that the City contracted to – but did not – pay for the dredging project, is then compared to the combined costs arising from the breach and the expenses to complete the work. If those costs exceeded the amount the City would have paid NEM to perform in accordance with the contract, then the City is contractually entitled to recover that difference from NEM. The contract thereby embodies the common law notion that these damages put an aggrieved party "in the same position that he or she would have enjoyed had there been no breach." *Lee v. Scotia Prince Cruises Ltd.*, 2003 ME 78, ¶ 22, 828 A.2d 210, 216. The City claims that in this case, those post-termination expenses and costs consist of the costs to complete the project and the expenses incurred to adjudicate its claim against NEM. Under the contract, these amounts are recoverable. The next step is to quantify them.

The largest single element of the City's damages claim against NEM is the cost incurred by the City to have Prock perform the dredge work. That cost exceeded $400,000. *See* exhibit 263. NEM argues that the project performed by Prock was

40

different that the project that it (NEM) contracted to perform. The basis of this contention is the divergence between the amount of work required by the contract and the more limited scope of work as set out in the original DEP permit, because the permit authorized less dredging in the intertidal area than the contract indicated. However, NEM's contractual obligation owed to the City was defined by the contract, which included the depictions of the area to be dredged. The permit was a necessary step in the execution of the project, and the City had the responsibility to obtain the permit. The City did so, and subsequently it also easily obtained an amended permit that was in accord with the actual work required by the contract. In the end, however, NEM was contractually required to dredge the areas that were identified in that instrument, which later became reflected in the amended permit. Prock's work was within the scope of the contract that NEM had executed with the City, and so the City is entitled to recover the expense incurred by the City to acquire performance by Prock for the work that NEM itself was to provide.

NEM also opposes this element of damages because Prock dredged deeper into the harbor floor than NEM was required to dig. Under the contract, NEM was to dredge five feet below mean low water. Prock was paid based on a depth of six feet.[6] However, Prock dredged a smaller volume than the amount that remained for NEM to remove, as of the time the City terminated that contract. Further, Prock's work was within the NEM contractual dredge area. Therefore, when measured by volume of spoil and by geographical parameters, Prock's work did not exceed the overall scope of the dredge work that NEM was to have performed. Because of these considerations, the different dredge configuration defining Prock's work – deeper into the harbor floor but not to the full limit of the contractual dredge boundaries – does not undermine the City's contention that its damage analysis includes the full cost of Prock's work. Finally, the evidence establishes that Prock's charges to the City were fair and reasonable.

In addition to the actual amount of money that the City paid to Prock, the City incurred expenses for engineering and surveying services and other charges associated

---

[6] As Prock's project manager testified, in some areas Prock dredged seven feet deep, although the City paid for six feet.

41

with the post-termination work. They are not in material dispute. The court accepts the evidence of those costs as outlined in exhibit 263.

Finally, the City incurred dispute resolution costs and court expenses, including attorney's fees of $87,699.13.[7] *See* exhibit 263, affidavit of attorney's fees. The attorney's fees established in the affidavit of counsel includes a deductible of $5,000, which is also included in exhibit 263. The amount of the City's deductible is therefore not awarded separately. The costs of litigation have not been placed in material dispute. The court independently concludes that those expenses are reasonable, including the attorney's fees that may be gauged against the legal fees claimed by NEM.

Exclusive of attorney's fees, the total amount of the City's expenses incurred to complete the dredge project and pursue dispute resolution of the pending claims is $481,995.15. This exceeds the unpaid balance of the NEM contract price by $232,118.15. The City is entitled to recover this amount from NEM. The City is also entitled to an award of attorney's fees in the amount of $87,699.13.

The City is also entitled to recover from NEM the amount that the City overpaid NEM for the work it performed prior to the contract termination. The amount of the City's excess payments is $107,375. Recovery of such damages is not specifically cited in the contract. However, the damages provisions of the contract make plain that the contractual measure of damages does not limit any other remedies that are available to the City. This allows the court to consider this aspect of the City's damages claim.

The City has framed its claim to recover the overpayment as both a form of contract recovery and as one for unjust enrichment. A party is entitled to relief for unjust enrichment only when it does not stand in a contractual relationship with the breaching party. *See Cummings v. Bean*, 2004 ME 93, ¶ 9, 853 A.2d 221, 224. Here, of course, the City and NEM were parties to a contract. The City therefore cannot recover on that basis. However, because NEM breached the contract and the City terminated the contract for cause, the City is entitled – as a result of NEM's breach – to recover the amount that NEM was paid but did not earn. An award based on this overpayment is necessary to

---

[7] The City's attorney has filed an affidavit in support of the claim for attorney's fees. Counsel followed the affidavit with a letter dated May 1, 2006, making a minor correction in the total fees claimed.

restore the City to the position it would have been in absent the breach. *Lee*, 2003 ME 78, ¶ 22, 828 A.2d at 216.

Accordingly, the City has proven damages for breach of contract in the total amount of $339,493.15, plus attorney's fees.

The entry shall be:

On the complaint, judgment is entered for the defendants.

On count 1 of the counterclaim, judgment is entered for the counterclaim plaintiff City of Ellsworth and against counterclaim defendant Northeast Marine Towing and Construction, Inc. in the amount of $339,493.15, plus pre-judgment interest at the annual rate of 4.28% and post-judgment interest at the annual rate of 9.42%. Counterclaim plaintiff is also awarded attorney's fees of $87,699.13. On count 2 of the counterclaim, judgment is entered for the counterclaim defendant.

Defendant Woodard & Curran is awarded its costs of court. The award of costs of court to defendant City of Ellsworth is included in the attorney's fees award and is not addressed separately.

Dated: April 9, 2008

_____
Justice, Maine Superior Court

RECEIVED & FILED

APR 17 2008

HANCOCK COUNTY COURTS

43